In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana




______________________________




No. 06-00 -00169 -CR


______________________________






TROY SHONNARD GLOVER, Appellant




V.




THE STATE OF TEXAS, Appellee





 



On Appeal from the 252nd Judicial District Court


Jefferson County, Texas


Trial Court No. 79738





 







Before Grant, Ross, and Cornelius,* JJ.


Opinion by Justice Grant






______________

*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment



O P I N I O N




 On June 5, 2000, Troy Shonnard Glover was convicted of sexual assault of a child pursuant to Tex. Pen. Code Ann. §
22.011 (Vernon Supp. 2002). The jury assessed punishment, enhanced by a previous felony conviction, at twelve years'
imprisonment. In five points of error, Glover complains the evidence was both factually and legally insufficient to support
his conviction. Glover further complains that hearsay testimony was erroneously admitted and that this amounted to a
violation of his confrontation rights under the United States and Texas Constitutions.

 The issue at trial was whether Glover, age twenty-six, (1) had sexual relations with A.H., the fourteen-year-old complainant. 
A.H. filed a complaint with the Beaumont police on May 14, 1999, but was unavailable to testify when the case was tried.
(2) The issues in this appeal are centered primarily around the admission of hearsay statements of the complainant, A.H., as
related in court by her mother, Diane.

 In his first point of error, Glover asserts the evidence was legally insufficient to support his conviction. In reviewing a
legal sufficiency challenge, we review all of the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Williams v. State, 937 S.W.2d 479, 482-83 (Tex. Crim. App. 1996). 

 A person commits the offense of sexual assault when he (1) intentionally or knowingly (2) causes the penetration of the
anus or female sexual organ of a child by any means. Tex. Pen. Code Ann. § 22.011(a)(2)(A). A child means a person
younger than seventeen years of age who is not the spouse of the actor. Tex. Pen. Code Ann. § 22.011(c). Rather than
alleging all statutory manners of committing the offense, the State only alleged that Glover intentionally and knowingly
caused the penetration of the female sexual organ of A.H. by inserting his male sexual organ. The age (fourteen) and
marital status (unmarried) of A.H. was uncontested and conclusively established at trial. 

 The State offered the following evidence of Glover's guilt. Ron Kyles, Sr. (A.H.'s uncle) ran Pleasure Island, a restaurant
where Glover worked. Kyles, Sr. testified he overheard Glover admit that "he screwed the s__t out of [A.H.]," and that
Glover would go to Mexico before he would go to jail. Ron Kyles, Jr. (A.H.'s cousin) also worked at Pleasure Island. He
testified to what he termed an "attempted seduction" of A.H. by Glover. The flirtatious encounter included winks, smiles,
touching, and games. He also testified (over objection) that A.H. had told him she had slept with Glover. Diane testified
Glover admitted to her that he had picked up A.H. at one a.m. on May 15 from her father's house and taken her to his
apartment. Paul Pirtle, a coworker of Glover, testified to a separate conversation with Glover wherein Glover admitted he
thought A.H. was "hot," that he knew she was only fourteen, and that he had picked her up and had sex with her. Pirtle also
related a second statement that Glover said he would "do whatever it took to . . . stop from going back to jail" if his liaison
with A.H. were discovered. Kandi Phillips, an ex-coworker of Glover, testified to a separate conversation during which
Glover said he was facing statutory rape charges for having sex with A.H. When Phillips asked Glover if he had "slept
with" (3) A.H., he said yes.

 Glover complains there was no direct evidence of penetration of the female sexual organ of the victim as alleged in the
indictment. He argues this renders the evidence legally insufficient. It is not necessary for a conviction to rest on direct
evidence. One witness providing circumstantial evidence of each element satisfies the State's burden with respect to legal
sufficiency. The State offered several different out-of-court admissions made by Glover, indicating that he had engaged in
the charged conduct.

 The State also offered the hearsay testimony of Diane. Glover argues that this evidence is inadmissible and that without
this critical evidence, the State's case is both factually and legally insufficient. While the admissibility of the
complained-of hearsay is discussed at length below, we will include the contested evidence in our review. When
addressing a challenge to the sufficiency of the evidence, even erroneously admitted evidence must be considered. 
Rodriguez v. State, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991). Diane testified that A.H. had admitted to two different
sexual encounters with Glover and that they had "used latex" or a condom. 

 Viewing all of the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential
elements of sexual assault of a child beyond a reasonable doubt. Glover's first point of error is overruled.

 In his second point of error, Glover asserts the evidence was factually insufficient to support his conviction. In reviewing a
challenge to the factual sufficiency of the evidence, we view all the evidence without the prism of "in the light most
favorable to the verdict." Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). We determine whether a neutral
view of all the evidence, both for and against the verdict, demonstrates that the proof of guilt is so obviously weak it
undermines confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly
outweighed by contrary proof. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). When performing this review,
we give due deference to the jury's assessment of the weight and credibility of the evidence. Id. at 20. We will find the
evidence factually insufficient only where necessary to prevent manifest injustice. Id. If we find the evidence factually
insufficient, we vacate the conviction and remand for a new trial. Jones, 944 S.W.2d at 648; Clewis v. State, 922 S.W.2d
126, 133-35 (Tex. Crim. App. 1996).

 The only testimonial evidence offered by Glover in his defense was that of Diane. He re-called her to the stand to testify
regarding a possible boyfriend who A.H. may have had at school. Glover also introduced several notes written by A.H. to a
classmate. A note dated January 15, 1999, and written by A.H. to a friend read, "I would tell you all about last night but all
of these wandering eyes don't need 2 know all about my sex life . . . ." A note by A.H. dated March 8, 1999, related how
upset A.H. was about having to move away from a boy for whom she had strong feelings, while another (no date) read that
she would do anything to be with him. The State introduced a separate note from April 15, 1999, wherein A.H. indicated
she thought her parents were taking her to a doctor to "see if [she] had sex or something," but confided to her friend that
she had not done so. A.H. also stated how strongly she wanted to see another boy from school. Glover argues that the
letters show A.H. may have had relations with boys her own age and that to protect these boys, she fabricated Glover's
involvement. The remainder and greater part of Glover's factual sufficiency argument centers on challenging the credibility
of the witnesses who testified to Glover's various admissions. 

 Unless the record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination
concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of
credibility and demeanor that the jury is better situated to make. Johnson, 23 S.W.3d at 8. The same holds true for
uncontradicted witness testimony where the credibility of the evidence is challenged by cross-examination. In this case,
several witnesses testified to Glover's admissions of sexual congress with A.H. Each witness was cross-examined. 
Although other people were also present when the admissions were made, Glover did not call them to either refute or
explain the context of prior witnesses' testimonies regarding the admissions. Possible relationships between boys at school
and A.H., even if established, would not negate her contact with Glover. The case rests primarily on the credibility of the
State's witnesses, combined with the jury's understanding of what the phrases "screwed the s__t out of," "had sex with," and
"slept with" meant. 

 A neutral view of all the evidence, both for and against the verdict, demonstrates the proof of guilt was not so obviously
weak it undermined confidence in the jury's determination. The proof of guilt was not greatly outweighed by contrary
proof. The evidence was factually sufficient to support the conviction. Glover's second point of error is overruled.

 In his third and fourth points of error, Glover complains of the admission of hearsay statements made by A.H. Over proper
and timely objection of the defense, Diane was permitted to relate statements made by A.H. during a confrontation between
the two. Glover contends that this testimony was hearsay, not within any exception, and that the trial court erred in
admitting it. 

 Diane's testimony included the following: In May of 1999, A.H.'s parents were separated and living in different residences
in Beaumont. At around one a.m. on May 15 (the early morning after Mother's Day), A.H. sneaked out of her father's
house, and Glover picked her up. A.H.'s mother found out and called Glover to confirm he had picked A.H. up from her
father's. Diane confronted A.H. that same evening. At the time, Diane only knew about the events from the same day. She
told A.H., however, that she had already talked to Glover and that she "knew everything," but wanted to hear it from her
daughter. A.H.'s emotional condition was described as uptight, emotional, then increasingly shaky. This charged
emotional state was coupled with agitated behavior including crying and wringing of hands. Under the pressure of these
circumstances, A.H. revealed the hearsay statements to which her mother testified and of which Glover complains.

 Diane was permitted to testify to the out-of-court statements of A.H. The following exchange took place between the
prosecutor and Diane:

 Q. Was it your intention to confront [A.H.] regarding that situation [sneaking out of the house]?



 A. Yes.



 . . . .



 Q. . . . How did you confront her?



 A. Well, as soon as she came into the living room, I said, "We're going to talk about this. I've already talked to Troy. I
know everything. You're going to get a whipping for sneaking out of your house." I said, "I've already talked to Troy
[Glover]"; so, I didn't want any lies, I didn't want any shrugs of the shoulders, I didn't want to hear, "I don't know." . . . .



 [I told her] "By the way, I've already heard. So, tell me the truth."



 . . . .



 Q. When you told her to tell you what was going on, what had happened, what was the first thing she told you?



 MR. KIMLER [defense counsel]: Objection, Your Honor, it's hearsay, violation of right to confront and cross examine,
as well as due process. 



 THE COURT: Overruled.



 Q. (by Mr. Rodriguez) What was the first thing that she told you after you told her, "You better tell me the truth. I know
everything that's happened"?



 A. The very first thing she said is, "I snuck out of the house last night."



 I said, "No, I want to know everything, [A.H.]."



(At this point, defense counsel requested and was granted a running objection to the testimony regarding hearsay statements
of A.H.)

 Q. What did she say then?



 A. She said, "He picked me up last Sunday."



 Q. Now, she said, "He picked me up last Sunday." At this point you're not talking about Mother's Day anymore, are you?



 A. No.



 Q. She's talking now about the previous Sunday.



 A. Right.



 . . . .



 Q. What was the next thing she told you?



 A. She said, "He took me to his apartment, and we had sex."



 Q. Did she describe anything about anything that happened leading up to having sex?



 A. She said, "We danced, listened to music; and then we had sex."



 And I said, "Where?"



 She said, "On the floor."



 . . . .



 Q. What was the next thing that you asked her?



 A. I said, "Oh, my God, [A.H.]. Was it safe sex?"



 She said, "Yes."



 And I said, "So, what's safe sex?"



 And she said, "Latex, Mom."



 Q. Referring to a condom?



 A. Yes.



 . . . .



 Q. (By Mr. Rodriguez) On the day that you confronted [A.H.] when you found out what had actually happened, on that
day what did she tell you was the truth about [a different] day she was supposedly late from school?



 A. Troy [Glover] had picked her up from school after school, had taken her to his apartment and had sex again and
brought her back home.



 Q. Was it after this that you contacted the Beaumont Police Department?



 A. Yes, sir.



 At trial, the State had argued this testimony should be admitted under either Rule 804(b)(3), as a statement of personal
family history, or under Rule 803(3), as a statement of then-existing mental condition. (4) See Tex. R. Evid. 803, 804. The
trial court allowed all of the hearsay testimony. No requests for limited admissibility of this testimony were made, and no
limiting instructions were given to the jury. On appeal, the State has correctly abandoned Rule 804(b)(3) as a basis for
admission. 

 Rule 803(3) creates an exception to the hearsay rule for a "statement of the declarant's then existing state of mind . . . but
not including a statement of memory or belief to prove the fact remembered or believed . . . ." Tex. R. Evid. 803(3). The
State that the evidence related to A.H.'s emotional state during the confrontation with her mother as well as to her
motivation for continuing acts of disobedience to her parents. These statements go well beyond A.H.'s then-existing
emotional state during the confrontation with her mother. They offer a description of past facts. The only purpose of the
statements in question was to prove Glover had sex with A.H. Evidence that seeks to establish a purported fact
remembered and related in the utterance is specifically excluded from the state of mind exception. Norton v. State, 771
S.W.2d 160, 166 (Tex. App.-Texarkana 1989, pet. ref'd). To the extent the hearsay statement implicates the declarant's
intent, plan, motive, and the like, the statement must relate to future conduct to be undertaken after the statement was made. 
See Jones v. State, 515 S.W.2d 126, 129 (Tex. Crim. App. 1974) (holding hearsay inadmissible under state of mind
exception because statement did not reflect intent or motive for future action, but only discussed preceding events). The
testimony of Diane, relating statements made by her daughter and seeking to establish the truth of facts remembered
regarding past events, is inadmissible under the state of mind exception to the hearsay rule. See Tex. R. Evid. 803(3). 

 The State also argues that the statements of A.H. were admissible as excited utterances. SeeTex. R. Evid. 803(2). It is
immaterial that this particular argument was not pressed at trial. If the trial court's decision is correct on any applicable
theory of law, it will be sustained. Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). This is especially true
with regard to the admission of evidence. Id. The admission of evidence is reviewed only for an abuse of discretion. 
Salazar v. State, 38 S.W.3d 141, 153-54 (Tex. Crim. App. 2001). The trial court's decision will be affirmed if it is within
"the zone of reasonable disagreement." Id. 

 An excited utterance is not excluded by the hearsay rule, regardless of the declarant's availability, and is defined as "[a]
statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by
the event or condition." Tex. R. Evid. 803(2). This exception has three requirements: (1) the statement must be a product
of a startling occurrence that produces a state of nervous excitement in the declarant and renders the utterance spontaneous
and unreflecting, (2) the state of excitement must still so dominate the declarant's mind that there is no time or opportunity
to contrive or misrepresent, and (3) the statement must relate to the circumstances of the occurrence preceding it. Sellers v.
State, 588 S.W.2d 915, 918 (Tex. Crim. App. [Panel Op.] 1979). The court need not examine each requirement
independently, but should focus instead on whether their combined effect shows the statement to be sufficiently reliable. 
Id. In discussing the application of this exception, the Court of Criminal Appeals recently reiterated that

 It is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the
startling event; these are simply factors to consider in determining whether the statement is admissible under the excited
utterance hearsay exception. The critical determination is "whether the declarant was still dominated by the emotions,
excitement, fear, or pain of the event" or condition at the time of the statement.



Salazar, 38 S.W.3d at 154 (citations omitted) (quoting McFarland v. State, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992)).

 The theory of the excited utterance exception is that circumstances may produce a condition of excitement that temporarily
stills the capacity for reflection and produces utterances free of conscious fabrication. 2 Goode, Wellborn & Sharlot, Texas
Practice: Texas Rules of Evidence: Civil and Criminal § 803.3 (2nd ed. 1993). The requirement the exclamation relate to
the occurrence or its cause is not emphasized by the general theory of Rule 803(2). This type of hearsay is deemed reliable,
and therefore admissible, to the extent it is the spontaneous, involuntary product of an excited state of mind. See Parks v.
State, 843 S.W.2d 693, 697 (Tex. App.-Corpus Christi 1992, pet. ref'd). Spontaneity is the primary factor which makes
these statements reliable. De Leon v. State, 500 S.W.2d 862, 867 (Tex. Crim. App. 1973) (citing Fisk v. State, 432 S.W.2d
912, 915) (Tex. Crim. App. 1968)). The fact that they relate to some occurrence other than the startling event itself or its
cause should not make them less reliable. See Bondurant v. State, 956 S.W.2d 762, 765 (Tex. App.-Fort Worth 1997, pet.
ref'd).

 The time elapsed between the crime and the utterance is also not a critical factor. The key is not whether there was an
opportunity for reflection between the crime itself and the utterance in question. The critical element is the relationship
between the utterance and the triggering event. A statement that is simply a narrative of past events or acts, as
distinguished from a spontaneous utterance, does not qualify as an excited utterance no matter how soon after the event it is
made. First Southwest Lloyds Ins. Co. v. MacDowell, 769 S.W.2d 954, 959 (Tex. App.-Texarkana 1989, writ denied). The
only requirement concerning time is the necessity that the statement be made while in a state of excitement caused by the
startling event. City of Dallas v. Donovan, 768 S.W.2d 905, 908 (Tex. App.-Dallas 1989, no writ). The circumstances
must show that it was the event speaking through the person and not the person speaking about the event. First Southwest,
769 S.W.2d at 959.

 The startling event that triggers the excited utterance need not be the crime itself, as long as the statement produced by the
event is probative of an issue in the case. See Tex. R. Evid. 402 (stating all relevant evidence admissible); see also Hunt v.
State, 904 S.W.2d 813, 815 (Tex. App.-Fort Worth 1995, pet. ref'd). In Hunt, an eleven-year-old girl was sexually
assaulted by her father's friend. Three months later, she saw a television show about a young rape victim who had been
stabbed by her attacker. Id. at 815. The girl began to cry uncontrollably. Id. When her mother questioned why she was
crying, the girl told her mother about the sexual assault. Id. At trial, the victim testified that on seeing the news program,
she had become fearful that she might be pregnant. Id. at 816. The victim's mother was also permitted to testify, over
objection, to the contents of the conversation. Id. The court held that the shock of seeing the television news program
triggered the victim's out-of-court statements, and her fear of pregnancy was startling enough to produce a state of nervous
excitement so as to render her subsequent remarks spontaneous. Id. at 816-17.

 There are similarities between Hunt and the present case, but the differences predominate. Here, A.H. revealed the
existence of a statutory sexual assault under the stress induced by conditions completely independent of the alleged crime
itself. The most obvious distinctions are the age of the declarant (fourteen versus eleven), and the fact that A.H. was
unavailable to testify. The stressful event which triggers the statements is also distinguishable. A.H.'s stress was induced
by her mother's questions in the context of a confrontation. The confrontation itself was intentionally stressful, calculated
to elicit a confession from A.H. about sneaking out of her father's house. As indicated by Diane, A.H. was dominated by
the emotions, excitement, and fear of disappointing her mother, combined with the threat of receiving a "whipping" for
sneaking out. In Hunt, the declarant's stress arose spontaneously in response to an independent and otherwise nonstressful
experience. The distinction here is not unlike the distinction between someone blurting out their complicity in a crime
when asked why they are upset and someone breaking down and confessing to a crime under the pressure of interrogation. 
The former is spontaneous, the latter is not.

 In this case, the question is whether the combined effect of the three Sellers factors suggest that A.H. was not likely to
engage in conscious reflection or fabrication before answering her mother's questions. To answer this question, we must
examine the totality of the circumstances within which the statements were made. The reliability of an excited utterance
must be determined by considering the overall effect of the three criteria as indicia of reliability. See Sellers, 588 S.W.2d at
918. A.H. does not respond in a spontaneous fashion, but responds directly to what she believes her mother was asking. (5) 
When she confronted A.H., Diane said she had already talked to Glover, so she knew everything, but wanted to hear it from
A.H. When A.H. started to talk about the previous night, Diane stopped her and said, "No, I'm talking everything." 
According to the testimony, it is at this point that A.H. began to talk about the sexual encounter from the prior week. Diane
was surprised by this revelation, for she had not been aware of the prior encounter. The State argues the mother's surprise
at this point shows the responses of A.H. are spontaneous. The fact that her mother was referring to the previous night, and
was surprised by what A.H. said about the previous week, is irrelevant. The spontaneity of the statements cannot be
measured by the expectations of the listener; only the speaker's perspective is important in determining spontaneity.

 In this case, Diane's questions were calculated to elicit information about past events and activities, even if the specific
data elicited was unanticipated. Responses to this type of questioning are not spontaneous. Responses to this type of
questioning are normally considered reflective narratives of past events. This is the qualitative difference between the
circumstances in this case compared to those in Hunt. There, the questions were generalized, meant to ascertain how the
girl was feeling and why she was crying. Here, Diane's questions were specifically intended to elicit details of past events
of which the questioner was presumed to be already aware. In Hunt, the younger child's age of eleven makes her less likely
to consider the consequences of her answers. The child in Hunt was also not placed under any threat of punishment. Here,
the older A.H. has already been placed under a disciplinary threat, making her much more likely to consider the
consequences of her answers before making them. Unlike Hunt, the circumstances in this case suggest reflective
consideration and allow an opportunity for conscious fabrication.

 The statements of A.H. comprise a reflective, narrative account of past events. They were made in response to direct,
specific questions that were calculated to elicit the type of responses given, even though the contents of the responses were
unanticipated. A statement that is simply a narrative of past acts or events is distinct from an excited utterance and does not
qualify under Rule 803(2) regardless of how soon after the event it is made. First Southwest, 769 S.W.2d at 959
(citingGulf, C. & S.F.R. Co. v. Moore, 69 Tex. 157, 6 S.W. 631 (1887)). A.H. may have been upset, but that does not make
her statements excited utterances. Her age and the threat of punishment make the statements more likely to be reflective
and premeditated. The danger of allowing expansion of the excited-utterance exception to include this type of information
is that it will become as broad and indeterminate as the former res gestae exception. (6) 

 The statements of A.H. do not fall within the excited-utterance exception to the hearsay rule. We cannot say the statements
in issue were spontaneous and unreflecting, or made without the opportunity to contrive or misrepresent. See Sellers, 588
S.W.2d at 918. This conclusion is not within the zone of reasonable disagreement. 

 The State also contends that the statements of A.H. are admissible as statements against "social" interest. See Tex. R.
Evid. 803(24); Robinson v. Harkins & Co., 711 S.W.2d 619, 621 (Tex. 1986). The rule applies to a statement which, at the
time made, so far tends "to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in
declarant's position would not have made the statement unless believing it to be true." Tex. R. Evid. 803(24). Whether a
statement is in fact against the interest of the declarant must be determined from the circumstances of each case. Cofield v.
State, 891 S.W.2d 952, 956 (Tex. Crim. App. 1994) (discussing statement against penal interest). To be admitted on the
basis it would subject the declarant to disgrace, the statement must be "in the context of the declarant's social interests," and
must be against such interests at the time it was made. Burks v. State, 40 S.W.3d 698, 701 (Tex. App.-Waco 2001, pet.
ref'd) (citingOwens v. State, 916 S.W.2d 713, 718 (Tex. App.-Waco 1996, no pet.); Bell v. State, 877 S.W.2d 21, 24 n.2
(Tex. App.-Dallas 1994, pet. ref'd)).

 The statements of A.H. contain a confession of sexual relations between a fourteen-year-old girl and a twenty-six-year old
man. Examining the circumstances, a reasonable person in A.H.'s position would have known that her statements would
subject her to disgrace in the eyes of her mother. That A.H. recognized and understood this is illustrated by the fact that
she took pains to hide her conduct from her parents by sneaking out of her father's house and by keeping her liaison a
secret. She made the statements reluctantly, and only when confronted by the possibility that her mother already knew the
"secret." The audience was A.H.'s mother. A.H. was fourteen and still lived with her mother, so A.H. was still subject to
her mother's authority and control. The risk to A.H. of being untruthful was that certain punishment would be
compounded, because she was told that her mother already "knew everything." Considering all of the circumstances, we
conclude that the statements of which Glover complains fall within the scope of Rule 803(24), in that they would so far
tend to subject the declarant to disgrace that a reasonable person in her position would not have made these statements
unless believing them to be true. Tex. R. Evid. 803(24). 

 We cannot say that the admission of this evidence was error amounting to an abuse of discretion. See Salazar v. State, 38
S.W.3d 141, 153-54 (Tex. Crim. App. 2001). Glover's third and fourth points of error are overruled.

 In his fifth point of error, Glover argues the trial court erred in admitting the out-of-court statements of A.H. in violation of
Glover's right to confront witnesses under the United States and Texas Constitutions. 

 The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be
confronted with the witnesses against him." U.S. Const. amend. VI. Admission of hearsay evidence against a criminal
defendant implicates the Confrontation Clause of the Sixth Amendment because the defendant is denied the opportunity to
confront the out-of-court declarant. U.S. Const. amend. VI.; Guidry v. State, 9 S.W.3d 133, 149 (Tex. Crim. App.
1999),cert. denied, 531 U.S. 837 (2000) (citing Ohio v. Roberts, 448 U.S. 56, 63 (1980)). In considering this constitutional
issue, the decision of the trial court is reviewed de novo. Guzman v. State, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). 
Not all hearsay violates the Confrontation Clause. A hearsay statement is per se reliable for Confrontation Clause purposes
if it falls within a firmly rooted exception to the hearsay rule. Guidry, 9 S.W.3d at 149-50 (citing White v. Illinois, 502 U.S.
346, 356 (1992)). Admission of evidence under a firmly rooted hearsay exception satisfies the constitutional requirement
of reliability because of the weight of longstanding judicial and legislative experience in assessing trustworthiness of
certain types of out-of-court statements. Idaho v. Wright, 497 U.S. 805, 817 (1990).

 The hearsay exception for a statement against social interest, a statement that tends to subject the declarant to hatred,
ridicule, or disgrace, is not a firmly rooted hearsay exception. Rule 803(24) was promulgated in 1985, and became
effective September 1, 1986. (7) Before that date, Texas law did not recognize an exception for a declaration against social
interest. See 2 Steven Goode et al., Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal § 803.29
(2d ed. 1993 & Supp. 2001); see also David A. Furlow and Lisa H. Pennington, Determining What Types of Hearsay
Disparage A Declarant's "Social Interest": An Innovation for Texas Evidence Law, 48 Tex. B.J. 1058, 1062 (1985). Since
the rule was adopted, only a handful of Texas appellate courts have considered evidence admitted pursuant to this
exception. An exception for declarations against social interest has not existed long enough in Texas, nor is there any
significant judicial or legislative experience in assessing the trustworthiness of statements admitted under it, for such
declarations to be considered per se reliable for Confrontation Clause purposes.

 Although the evidence in this case does not fall within a firmly rooted exception to the hearsay rule, it may nonetheless be
sufficiently reliable for Confrontation Clause purposes if it has "particularized guarantees of trustworthiness." Guidry, 9
S.W.3d at 149 (citing Wright, 497 U.S. at 816; Roberts, 448 U.S. at 66)). The central concern of the Confrontation Clause
is to ensure the reliability of evidence against a defendant by subjecting it to rigorous testing in an adversarial proceeding
before the trier of fact. Lilly v. Virginia, 527 U.S. 116, 124-25 (1999) (quoting Maryland v. Craig, 497 U.S. 836, 845
(1990)). Some statements that do not fit into a firmly rooted hearsay exception may have other particularized guarantees of
trustworthiness that serve as a proxy for cross-examination, allowing the statements to be admitted without offending the
confrontation rights guaranteed to a criminal defendant. 

 The trustworthiness of hearsay evidence must be evaluated in light of the totality of the circumstances, considering only
those circumstances that surround the making of the statement and that render the declarant particularly worthy of belief.
Guidry, 9 S.W.3d at 150. Other evidence admitted at trial cannot be considered in determining trustworthiness. Id. The
trustworthiness requirement is satisfied if cross-examination would be of only "marginal utility." Muttoni v. State, 25
S.W.3d 300, 307 (Tex. App.-Austin 2000, no pet.) (citing Lilly, 527 U.S. at 134). Other evidence admitted at trial cannot
be used to corroborate the veracity of the hearsay or to support a claim that the statement bears the requisite guarantees of
trustworthiness. Muttoni, 25 S.W.3d at 307(citingLilly, 527 U.S. at 135 (holding the State may not bootstrap on the
trustworthiness of other evidence)). As the court in Guidry stated, "[T]here must be 'an affirmative reason arising from the
circumstances in which the statement was made' which provides a basis for rebutting the presumption that a hearsay
statement is not reliable." Guidry, 9 S.W.3d at 150 (quoting Wright, 497 U.S. at 819)).

 In this case, the same factors that bring the statements within the hearsay exception also guarantee reliability under the
Confrontation Clause. As shown above, the conditions under which the statements were made and the person to whom
they were made provide a basis for rebutting the presumption of unreliability. A.H.'s affirmative conduct in trying to
conceal her sexual relationship with Glover acknowledged that she knew her statements would subject her to disgrace in
the eyes of her mother. This provides a basis for the jury to assess the credibility of her statements. The defense was also
able to test the evidence by offering an alternative explanation for the statements. Glover's fifth point of error is overruled. 

 The judgment of the trial court is hereby affirmed.





 Ben Z. Grant

 Justice



Date Submitted: October 30, 2002

Date Decided: October 31, 2002



Publish

1. Evidence conflicted as to Glover's precise age, but all witnesses put his age between twenty-six and twenty-eight at the
time of the offense.

2. By the time of the trial, both A.H. and her father had died. The circumstances of their deaths were not in issue at trial.

3. She stated on direct examination that Glover admitted he "had sex with" A.H., but on cross- examination allowed that
the phrase may have been "slept with." Glover urges on appeal that this shows the testimony is not credible. The jury
determines the credibility of the evidence, not the appellate court. See Williams v. State, 692 S.W.2d 671, 676 (Tex. Crim.
App. 1984).

4. A. H. was over age twelve, so the State could not offer her statements through an outcry witness under Tex. Code Crim.
Proc. Ann. art. 38.072 (Vernon Supp. 2002). Even if she been twelve or younger, A.H. was unavailable to testify, so the
State would have been forced to find an alternative basis for admitting the hearsay statements.

5. This is distinct from Hunt v. State, 904 S.W.2d 813, 815 (Tex. App.-Fort Worth 1995, pet. ref'd), where the question was
generalized and did not anticipate any particular response.

6. See notes 2 through 5 and accompanying text in 2 Goode, Wellborn & Sharlot, Texas Practice: Texas Rules of
Evidence: Civil and Criminal § 803.3 (2nd ed. 1993), for criticism of the nebulous res gestae formulation.

7. Although a similar formulation was proposed by the U.S. Supreme Court, Congress deleted the social interest language
from the equivalent Federal Rule of Evidence 804(b)(3). See H.R. Rep. No. 93-650 at 7089 (1974), reprinted in 1974
U.S.C.C.A.N. 7075, 7089. Federal law still recognizes no hearsay exception for statements against social interest. Several
states, including California, have recognized a social interest exception. See, e.g., Cal. Evid. Code § 1230 (2001); Wis.
Stat.§ 908.045(4) (2001). Other states have considered and rejected the social interest exception. See, e.g., Heddings v.
Steele, 526 A.2d 349, 352-53 (Pa. 1987).



>We
review a trial courts decision on a motion to suppress evidence by applying a
bifurcated standard of review.  Graves v. State, 307 S.W.3d 483, 489
(Tex. App.Texarkana 2010, pet. refd);
Rogers v. State, 291 S.W.3d 148, 151 (Tex. App.Texarkana 2009, pet.
refd).  While we defer to the trial
court on its determination of historical facts and credibility, we review de
novo its application of the law and determination on questions not turning on
credibility.  Carmouche v. State,
10 S.W.3d 323, 332 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d
85, 89 (Tex. Crim. App. 1997); Villarreal
v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); Graves, 307 S.W.3d at 489. 

            We
also afford deference to a trial courts application of law to fact
questions, also known as mixed questions of law and fact, if the resolution
of those questions turns on an evaluation of credibility and demeanor.  Guzman,
985 S.W.2d at 89.  Since all the evidence
is viewed in the light most favorable to the trial courts ruling, we are
obligated to uphold the denial of McGraws motion to suppress if it was
supported by the record and was correct under any theory of law applicable to
the case.  Carmouche, 10 S.W.3d at 32728; State
v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). 

II.        Scope of Detention  

            No right is held
more sacred, or is more carefully guarded, by the common law than freedom from
unreasonable search and seizure as guaranteed by the Fourth Amendment to the United
States Constitution.  Terry v. Ohio, 392 U.S. 1, 9 (1968); State v. Williams, 275 S.W.3d 533, 536
(Tex. App.Texarkana 2008, no pet.).  A
search which is reasonable at its inception may violate the Fourth Amendment by
virtue of its intolerable intensity and scope. 
Williams, 275 S.W.3d at 536
(citing Terry, 392 U.S. at 18).  Thus, it is imperative that the scope or
purpose of a search be strictly tied to, and justified by, the circumstances
which rendered an invasion permissible in the first place.  Id. (quoting Florida v. Royer, 460 U.S. 491, 500
(1983); Terry, 392 U.S. at 1920,
29).  

            Because
a routine traffic stop implicates the United States and Texas Constitutions,
the traffic stop must be reasonable.  Berkemer v. McCarty, 468 U.S. 420, 43637
(1984); Francis v. State, 922 S.W.2d
176, 178 (Tex. Crim. App. 1996); see U.S. Const. Amend. IV; Tex. Const. art. I, § 9.  We employ the test developed in Terry to determine the reasonableness of
an investigative detention; thus, we inquire:  (1) whether the officers action was
justified at its inception; and, (2) whether it was reasonably related in scope
to the circumstances which justified the interference in the first place.  Davis
v. State, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997).

            Under
the first prong, the police officer must be able to point to specific and
articulable facts which, taken together with rational inferences from those
facts, reasonably warrant that intrusion.  Davis,
947 S.W.2d at 242 (quoting Terry, 392
U.S. at 21).  The specific, articulable
facts, along with rational inferences from those facts, must allow the officer
to reasonably conclude that the person detained actually is, has been, or soon
will be engaged in criminal activity.  United States v. Sokolow, 490 U.S. 1, 10
(1989).

            The
second prong of Terry requires the
scope of the detention to be like any other search, [and it] must be strictly
circumscribed by the exigencies which justify its initiation.  Davis,
947 S.W.2d at 243 (quoting Terry, 392
U.S. at 2526).  The officer, however,
must diligently pursue a means of investigation that lasts no longer than is
necessary and should be the least intrusive means reasonably available.  Id. at
245.  A law enforcement officer may rely
on information, obtained in the course of his or her contact with a citizen, in
justifying further detention.  Powell v. State, 5 S.W.3d 369, 377 (Tex.
App.Texarkana 1999, pet. refd).

            If
an officer has a reasonable basis for
suspecting that a person has committed a traffic offense, the officer may
legally initiate a traffic stop.  Graves, 307 S.W.3d at 489; Zervos v. State, 15 S.W.3d 146, 151
(Tex. App.Texarkana 2000, pet. refd); see
Tex. Code Crim. Proc. Ann.
art. 14.01(b) (Vernon 2005).  McGraw was
stopped for following too close to the vehicle in front of her and for
speeding.  McGraw does not contest the
legality of the initial traffic stop.

            Rather, McGraws
complaint is that the duration of the traffic stop exceeded the permissible
scope.  It is the States burden to
demonstrate that the seizure it seeks to justify was sufficiently limited in
scope and duration to satisfy the conditions of an investigative seizure.  Williams,
275 S.W.3d at 536 (citing Royer, 460
U.S. at 500).  The following findings
were entered by the trial court: 

1.         On January 19, 2009, Deidra McGraw was stopped by Royse City
Police Officers for traffic violations.

2.         After the initial stop and being asked very particular
questions, Deidra McGraw lied about facts in her response to the police
officers. 

3.         Deidra
McGraw lied about her criminal record to police officers. 

4.         Based upon this deceit, Royse City Police Officers had
enough reasonable suspicion to believe that there was a fair probability of
inculpatory evidence in Deidra McGraws automobile. 

 

III.       Factual Background 

            Officers Shaun
Meek, Rushing, and Mosely[1]
were patrolling along Highway I-30 at nighttime in three separate patrol
units.  Meek testified that two vehicles
with out of state license plate[s] were following extremely close to each
other and speeding, 70 in a 65 when they passed in front of the officers.  The officers proceeded to follow up behind
the vehicles, which continued to speed. 
Rushing pulled over the rental car driven by McGraw, and Mosely pulled
over the other vehicle.  

            From
Meeks recollection, and the video recording of the stop, Rushing indicated
McGraw had shaky hands on the steering wheel, refused to make eye contact,
and had a nervous appearance about her, by how fast and hard she was chewing
her gum.  Rushing explained the reason
for the traffic stop and asked McGraw if she was following the vehicle in front
of her.  Although McGraw agreed that she
was driving too closely, she denied following the other vehicle, stated she did
not know the driver of the other vehicle, and claimed she was travelling alone.

            Rushing
asked for McGraws drivers license and learned that she was from Austin.  McGraw stated that she was travelling to
Tennessee to locate her father, although a Mapquest printout observed by
Rushing through the window depicted directions to Indiana, and the car in front
of McGraw had Indiana license plates. 
After telling McGraw that she would only be receiving warnings for the
traffic offense, Rushing went back to the patrol car to run her drivers
license number.  In addition to the
indicators of nervousness, Rushing was concerned that McGraw seemed way too
friendly.  

            Rushing
was communicating with Mosely while running McGraws license.  Mosely advised Rushing that the vehicle in
front of McGraw was driven by Cornealius Neal, who was also acting
nervously.  Although McGraw and Neal were
driving out-of-state vehicles, they both possessed Texas drivers
licenses.  Neal was also from Austin and contradicted
McGraws story by claiming that he knew her. 
Rushing wrote the warnings for the traffic offenses, but did not deliver
them.  McGraws drivers license check
came back unclear and that she had been arrested several times for large
amounts of illegal narcotics.  Because
Rushing believed that he caught McGraw in a lie, Rushing asked McGraw to step
outside of her vehicle so that he could question her further about her
relationship with Neal.  Realizing that
Neal claimed to know her, McGraw changed her story and admitted that she knew him.
 However, when asked about her criminal
record, McGraw lied by stating she had only been arrested for theft by
check.  

            McGraw
denied consent for Rushing to search the vehicle.  Rushing then called for a Greenville canine
unit.  While waiting for the unit, McGraw
stated that Neal was going to Indiana, but that she was stopping in
Tennessee.  She claimed they had not been
anywhere else together, but Neal had confessed to travelling with McGraw to
Abilene.  The canine unit arrived,
alerted to McGraws trunk, and officers located approximately eighty-one pounds
of marihuana inside several suitcases. 
The entire stop lasted approximately thirty minutes. 

IV.       Further Detention Was
Warranted 

            The scope of an
officers inquiry is limited to investigation of the traffic violation and a
few routine inquiries.  Williams, 275 S.W.3d at 536.  McGraw argues that the traffic stop concluded
when she was told by Rushing that she would only receive warnings for the
traffic offense.  However, because
Rushing had not delivered the warnings and had not received the report on
McGraws drivers license, the traffic stop had not concluded.  Courts recognize that during a traffic stop,
the officer has a right to check for outstanding warrants and to examine the
detainees drivers license, insurance, and identification.  Id.
(citing Cisneros v. State, 165 S.W.3d
853, 859 (Tex. App.Texarkana 2005, no pet.)); Powell, 5 S.W.3d at 377.  It
is only after this computer check is completed and the officer knows that this
driver has a currently valid drivers license, no outstanding warrants, and the
car is not stolen, that the traffic-stop investigation is fully resolved.  Kothe
v. State, 152 S.W.3d 54, 6364 (Tex. Crim. App. 2004).  

            Once
a police officer makes a lawful traffic stop, he or she may also investigate
any other offense the officer reasonably suspects has been committed.  Bachick
v. State, 30 S.W.3d 549, 55152 (Tex. App.Fort Worth 2000, pet.
refd).  Further detention for
investigation beyond the traffic violation requires the officer to have a
reasonable suspicion of further criminal activity.  To be reasonable, a traffic stop must be
temporary and last no longer than is necessary to effectuate the purpose of the
stop.  Davis, 947 S.W.2d at 245. 
The propriety of the length of the detention is judged by assessing
whether the police diligently pursued a means of investigation that was likely
to quickly dispel or confirm their suspicions. 
United States v. Sharpe, 470
U.S. 675, 686 (1985).  Any continued
detention must be based on articulable facts which, when taken together with
rational inferences from those facts, would warrant a person of reasonable
caution in the belief that a continued detention was justified, i.e., the
detainee was or would soon be engaged in criminal activity.  See
Davis, 947 S.W.2d at 24445.  

            We
find that while the traffic stop was ongoing, and through routine inquiries,
Rushing obtained information which gave him reasonable suspicion to suspect
McGraw was engaged in criminal activity. 
Upon initial contact, McGraw nervously stated she was travelling alone
and denied any knowledge of the driver of the vehicle she was following, but
Rushing determined from the other officer that the other driver acknowledged
their acquaintanceship.  McGraw told the
officer she was travelling to Tennessee to see her father, but a Mapquest
printout indicated directions to Indiana. 
The license check was returned as unclear, showing several arrests for
illegal substances, even though McGraw only admitted to one arrest for
theft.  Finally, McGraw changed her story
that she did not know the other driver and admitted that she knew Neal.  Rushing testified that training and
experience showed that two vehicles may travel together during the course of
drug trafficking to allow one of the vehicles to act as a decoy; many times the
officer can only stop one vehicle.  From
Rushings experience, the fact that both drivers knew each other, but McGraw
initially denied it, had changing and inconsistent stories, the vehicles were
travelling together at nighttime in rental cars with out-of-state license
plates, together with McGraws suspicious drivers license report, led to a
reasonable belief that McGraw and Neal were transporting drugs.  Finally, the delay for the further
investigation by a canine unit was of relatively short duration, as the entire
stop lasted less than thirty minutes.  

            Giving
the trial court appropriate deference in its finding that Rushing had enough
reasonable suspicion to believe that there was a fair probability of
inculpatory evidence in Deidra McGraws automobile based upon her deceit, we
conclude there was no error in the denial of McGraws motion to suppress.  

V.        Conclusion


            We
affirm the trial courts judgment.  

 

                                                                                    Jack
Carter

                                                                                    Justice

 

Date Submitted:          April 21, 2011

Date Decided:             April 27, 2011

 

Do Not Publish











[1]Rushings
and Moselys first names are not mentioned in the record.